# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | | |
|---|---|---|
| **MARLIN THOMAS** | * | **CIVIL ACTION NO.  15-0026** |
| **VERSUS** | * | **JUDGE S. MAURICE HICKS** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

### REPORT AND RECOMMENDATION

Before the court is 1) plaintiff's complaint for judicial review of the Commissioner's denial of social security disability benefits; and 2) plaintiff's motion for summary judgment [doc. # 18].  The district court referred these matters to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that plaintiff's motion for summary judgment [doc. # 18] be DENIED, that the final decision of the Commissioner be AFFIRMED, and that this matter be DISMISSED with prejudice.

### Background & Procedural History

On March 1, 1996, Marlin Thomas filed the instant application for Title II Disability Insurance Benefits.  *See* Tr. 86.[1]  On July 28, 1999, the Commissioner issued a final decision, denying Thomas's claim through the Appeals Council level.  *See* Tr. 83-95.  Accordingly, on October 1, 1999, plaintiff filed a complaint for judicial review before this court.  *Thomas v. Apfel*, Civil Action No. 99-1815 (W.D. La.).  On January 10, 2001, the Commissioner conceded

---

[1]  The abbreviated citation format references page 86 of the administrative transcript, which is filed in the record as an attachment to the Commissioner's Answer [doc. # 14].

that plaintiff's asthma met Listing 3.03B, and filed a motion to reverse and remand the Commissioner's decision with instructions to find plaintiff disabled as of his alleged onset date of February 26, 1996, pursuant to the fourth sentence of 42 U.S.C. § 405(g).  *Id*.  Magistrate Judge Roy Payne signed the proposed judgment on January 12, 2001, which the Clerk entered on January 16, 2001.  (Tr. 99).

Meanwhile, on May 8, 2003, the Department of Veterans Affairs ("VA")  increased Thomas's disability rating to 100 percent permanent and total disability as a result of his asthma. (Tr. 309).  Nonetheless, from 2005-2010, Thomas attended VA-sponsored vocational rehabilitation training, which, according to Thomas, the VA terminated because he could have an asthma attack while seated at a desk.  (Tr. 244).  From August 2010 until January 2011, Thomas participated in the Social Security Administration's Ticket-To-Work program.  *Id*.  However, he ceased working after he realized that his asthma attacks prevented him from meeting the job demands.  *Id*.

In 2011, the state agency initiated a continuing disability review ("CDR") to determine whether Thomas's disabling conditions had experienced medical improvement.  *See* Notice of Continuing Disability Review, Pl. Amend. Compl., Exh. C [doc. # 9-1]; *see also* CDR Determination Notice, Form SSA-833-U3 (Tr. 101) (indicating that review was initiated because of "05" Code, which denoted "Medical Improvement Possible (3 Year Periodic Review Diary").[2]

On October 16, 2012, the state agency determined that, as of that date, Thomas had experienced medical improvement, and that his benefits would terminate effective December 31, 2012.  (Tr. 101-102, 129-131).  Thomas asked the state agency to reconsider its decision, and

---

[2]  SSA's Program Operations Manual System ("POMS"): DI 13095.135 WHY REVIEW WAS MADE (WRM) (ITEM 20 OF SSA 833-U5).

elected to continue receiving benefits while he appealed the determination.  (Tr. 132, 248-249).

A disability hearing officer considered Thomas's request for reconsideration, but in a July 16,

2013, decision, found Thomas not disabled because of lack of evidence stemming from

Thomas's refusal to attend a consultative examination(s), as well as the reconsideration hearing.

(Tr. 137-147).

Thereafter, Thomas requested and received a March 6, 2014, hearing before an

Administrative Law Judge ("ALJ").  (Tr. 30-82).  However, in a July 16, 2014, written decision,

the ALJ determined that Thomas's disability ended as of December 31, 2012.  (Tr. 8-20).

Thomas appealed the adverse decision to the Appeals Council.  On November 19, 2014,

however, the Appeals Council denied Thomas's request for review; thus the ALJ's decision

became the final decision of the Commissioner.  (Tr. 1-4).

In its decision, the Appeals Council noted that, pursuant to a new disability application

filed by Thomas on July 21, 2014, the state agency had subsequently found Thomas disabled as

of June 20, 2013.  (Tr. 2).  Thus, in effect, the instant appeal is limited to a six month period

from December 31, 2012,  until June 20, 2013.

On January 2, 2015, Thomas filed the instant pro se complaint for judicial review of the

Commissioner's denial of social security disability benefits.  He filed an amended complaint on

March 20, 2015, as well as a motion for summary judgment on August 12, 2015.  (Amend.

Compl. [doc. # 9]; MSJ [doc. # 18]).  In further support of his claim, plaintiff filed various

memoranda, raising myriad arguments, and attaching both old and new evidence.  *See* doc. #s 11,

17, 21, 25, 28, 32, 34.  Briefing is complete; the matter is before the court.

## Standard of Review

This court's standard of review is (1) whether substantial evidence of record supports the

ALJ's determination, and (2) whether the decision comports with relevant legal standards. *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). Where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's decision is not supported by substantial evidence when the decision is reached by applying improper legal standards. *Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. at 401. Substantial evidence lies somewhere between a scintilla and a preponderance. *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991). A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

### Cessation of Disability

Federal law provides that "[i]n any case where an individual is or has been determined to be under a disability, **the case shall be reviewed** by the applicable State agency or the Commissioner of Social Security (as may be appropriate), for purposes of continuing eligibility at least once every 3 years . . ." 42 U.S.C. § 421(i) (emphasis added). However, a disability recipient's benefits "may be terminated only if substantial evidence demonstrates *both* that 'there has been any medical improvement' *and* that 'the individual is now able to engage in substantial gainful activity.'" *Hallaron v. Colvin*, 578 F. App'x 350, 353 (5th Cir. 2014) (citing 42 U.S.C. § 1382c(a)(4)(A)). Importantly, a finding of continuing disability is not required where the benefits recipient "fails, without good cause, to cooperate in a review of his or her entitlement or

to follow prescribed treatment which would be expected [ ]to restore his or her ability to engage in substantial gainful activity . . ."  42 U.S.C. § 1382c(a)(4)(C)).

The Commissioner has prescribed regulations to implement the foregoing review requirement.  Specifically, a disability recipient's benefits will be terminated only where the Commissioner determines:

a)   that there has been medical improvement in the individual's impairment or combination of impairments that is related to the individual's ability to work;[3]

b)   or that one or more exceptions to medical improvement applies; and

c)   in addition to a) or b), that the individual is currently able to engage in substantial gainful activity.

20 C.F.R. § 404.1594(a) (paraphrased).

In evaluating the above-enumerated issues, the Commissioner employs an eight-step sequential analysis:

1.   Whether the individual is engaged in substantial gainful activity? (if so, the Commissioner will find that disability has ended).

2.   Whether the claimant has an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, disability will be found to continue).

3.   If not, has there been medical improvement?  (If so, step 4 is considered; if not, go to step 5).

4.   If there has been medical improvement, is it related to the individual's ability to perform work?  (If not, go to step 5; if so, go to step 6).

5.   If there was no medical improvement at step 3 or the medical

---

[3]  The regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] or continued to be disabled."  20 C.F.R. § 404.1594(b)(1).

improvement was not related to the individual's ability to work at step 4, does an exception apply?  (If not, disability continues; if one of the first exceptions to medical improvement applies, then go to step 6; if an exception from the second group of exceptions to medical improvement applies, then disability has ended).

6.      If there has been medical improvement related to the individual's ability to do work or if one of the first group of exceptions to medical improvement applies, are the individual's current impairments in combination severe? (If not, disability has ended).

7.      If the impairments are severe, is the individual able to engage in past relevant work?  (If so, disability has ended).

8.      If unable to perform past relevant work, is the individual capable of performing other work, given vocational consideration and residual functional capacity? (If so, disability has ended; if not, disability continues).

20 C.F.R. § 404.1594(f) (paraphrased).

The review may cease and benefits may be continued at any point in the analysis that the Commissioner determines that there is sufficient evidence to find that the individual is still unable to engage in substantial gainful activity.  *Id.*

In a continuing disability review applying the medical improvement standard, the government must, in all relevant respects, prove that the person is no longer disabled.  *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002) (citations omitted).

**The ALJ's  Decision**

a)      <u>Comparison Point Decision</u>

The ALJ determined that the most recent favorable medical decision finding the claimant disabled was Magistrate Judge Payne's judgment signed on January 12, 2001.  *See* Tr. 12-13. Thus, it served as the "comparison point decision" or "CPD."  *Id.*, *see also* 20 C.F.R. § 404.1594(b)(7).  The ALJ further determined that at the time of the CPD, the claimant suffered

from the medically determinable impairment of asthma, which met Listing 3.03B of 20 C.F.R.

404, Subpart P, Appendix 1.  *Id*.

b)    Steps One Through Four

The ALJ determined at step one of the sequential evaluation process, that the claimant did

not engage in substantial gainful activity throughout the relevant period.  (Tr. 13).  She found at

step two that, as of December 31, 2012, the claimant's impairments no longer met or equaled the

same listing that was met at the time of the CPD.  *Id*.  Consequently, she determined at steps

three and four, that the claimant had experienced medical improvement, and that the

improvement was related to his ability to perform work.  *Id*., *see also* 20 C.F.R. §

404.1594(c)(3)(i).

c)    Step Six

Having found that the claimant experienced medical improvement related to his ability to

work, the ALJ necessarily proceeded to step six of the sequential evaluation process.  At this

step, she determined that the claimant suffered from the severe impairments of asthma,

obstructive sleep apnea, and morbid obesity.  (Tr. 13).[4]  She concluded, however, that these

impairments were not severe enough to meet or medically equal any of the impairments listed in

Appendix 1, Subpart P, Regulations No. 4.  (Tr. 15).

d)    Residual Functional Capacity

The ALJ next determined that, as of December 31, 2012, the claimant had the residual

---

[4]  She further found that the claimant's medically determinable impairments of type II
diabetes, hypertension, GERD, and generalized anxiety disorder were non-severe.  (Tr. 13-15).

7

functional capacity ("RFC") to perform light work,[5] reduced by the need to avoid concentrated exposure to humidity/wetness, extreme heat, fumes, odors, and other pulmonary irritants.  (Tr. 14-19).

e)    Steps Seven and Eight

The ALJ concluded at step seven of the sequential evaluation process that the claimant had no past relevant work.  (Tr. 19).  Accordingly, she proceeded to step eight.  At this step, the ALJ determined that Thomas was a younger individual, with at least a high school education, and the ability to communicate in English.  (Tr. 19-20).  Transferability of skills was not an issue because Thomas had no past relevant work.  *Id*.  The ALJ then observed that, given Thomas's vocational factors, and the ability to perform the full range of light work, the Medical-Vocational Guidelines directed a finding of *not disabled* as of December 31, 2012.  20 C.F.R. § 404.1569; Rule 202.20, Table 2, Appendix 2, Subpart P, Regulations No. 4.  *Id*.

However, because Thomas's RFC *did* include nonexertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent his limitations eroded the occupational base for unskilled work at the light exertional level.  *Id*.  In response, the

---

[5]  Light work entails:
> . . . lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

VE identified the representative jobs of merchandise marker - light, *Dictionary of Occupational Titles* ("DOT") Code # 209.587-034; silver wrapper - light, DOT Code # 318.687-018; and dispatcher - light, DOT Code # 222.587-038, that were consistent with the ALJ's RFC and the claimant's vocational profile.  *Id.*[6]

The ALJ concluded that Thomas's disability ended as of December 31, 2012.  (Tr. 20).

## Analysis

### I.     Motion for Summary Judgment

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  Here, plaintiff is not entitled to judgment as a matter of law.  *See* discussion, *infra*.

### II.    Arguments Indirectly Related to the Commissioner's Decision

#### a)     Effect of the Court's Prior Judgment

One of the principal sources of plaintiff's frustration with the proceedings below is his impression that this court's 2001 judgment granting the Commissioner's motion to reverse and remand with instructions to award benefits, precludes the state agency or Commissioner from conducting the instant continuing disability review.  He contends that the state agency and Commissioner are barred by the doctrine of *res judicata* from revisiting, reversing, or usurping the 2001 judgment.  Plaintiff is mistaken.  Nothing in this court's 2001 judgment precludes the

---

[6]  The VE testified that for the merchandise marker, silver wrapper, and dispatcher jobs, there were 472,405, 430,346, and 453,755  positions available nationally.  (Tr. 20, 76-77).  This incidence of jobs constitutes a significant number of jobs in the "national economy."  42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

Commissioner and the state agency from fulfilling their statutory mandate to conduct continuing disability reviews, and to terminate benefits *if*, as here, subsequent developments establish that the disability recipient is no longer disabled.  *See* 42 U.S.C. § 421(i).

In addition, *res judicata* is a common-law concept prescribing that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 840 (6th Cir. 1997).[7]  It is self-evident that the *2012* medical improvement of plaintiff's formerly disabling condition is not an issue that was, or could have been addressed in the 2001 decision. In short, plaintiff's *res judicata* defense is groundless.  *See Wilson v. Chater*, 113 F.3d 1248 n.5 (10th Cir. 1997) (unpubl.) (rejecting collateral estoppel argument where applications were five years apart and the new ALJ relied on intervening evidence).

b)    <u>Ticket to Work Program</u>

Another source of plaintiff's ire is his steadfast belief that the Commissioner, and more particularly, workers at the SSA's Shreveport field office, impermissibly used his short-lived participation in the Ticket-to-Work program[8] as a basis for the instant CDR.  In support of his

---

[7]  "*Res judicata* bars the relitigation of the same claim or cause of action while collateral estoppel bars the relitigation of the same issue." *Id*.

[8]  According to a treatise on the subject,
[u]nder the Ticket to Work and Self Sufficiency program, a disabled claimant may use a ticket to work issued by the SSA to obtain employment services, vocational rehabilitation services, or other support services from an employment network which is of the claimant's choice and which is willing to provide such services to him or her. A claimant holding a ticket to work and self-sufficiency may assign the ticket to any employment network of his or her choice which is serving under the program and is willing to accept the assignment. The ticket itself consists of a document which evidences the SSA's agreement to pay an employment network, which is serving under the program and to which such ticket is assigned by a

argument, plaintiff cites the following statutory provision,

> **(1)** In any case where an individual entitled to disability insurance benefits under section 423 of this title or to monthly insurance benefits under section 402 of this title based on such individual's disability (as defined in section 423(d) of this title) has received such benefits for at least 24 months
>> **(A)** no continuing disability review conducted by the Commissioner may be scheduled for the individual solely as a result of the individual's work activity;
>> **(B)** no work activity engaged in by the individual may be used as evidence that the individual is no longer disabled; and
>> **(C)** no cessation of work activity by the individual may give rise to a presumption that the individual is unable to engage in work.
>
> **(2)** An individual to which paragraph (1) applies shall continue to be subject to
>> **(A)** continuing disability reviews on a regularly scheduled basis that is not triggered by work; and
>> **(B)** termination of benefits under this subchapter in the event that the individual has earnings that exceed the level of earnings established by the Commissioner to represent substantial gainful activity.

42 U.S.C. § 421(m).

However, in instances where an individual is using a ticket-to-work, the suspension of CDRs is controlled by 42 U.S.C. § 1320b-19(i),[9] which provides that the Commissioner, or applicable state agency, may not initiate a continuing disability review "**[d]uring** any period for which an individual is using . . . a ticket to work . . . 42 U.S.C. § 1320b-19(i) (emphasis added).

Here, it is manifest that plaintiff no longer was participating in the Ticket-to-Work program when the Commissioner initiated the instant CDR. Moreover, it is manifest that plaintiff's unsuccessful work attempt was not used as a basis for the Commissioner's decision

---

claimant, for such employment services, vocational rehabilitation services, and other support services as the employment network may provide to the claimant. 53 SOC. SEC. LAW & PRAC. § 44:160 (2015).

[9] *See* 42 U.S.C. § 421(i)(5).

that he no longer was disabled.  In fact, the ALJ explicitly found that Thomas had not engaged in substantial gainful activity throughout the relevant period.  *See* discussion, *supra*.

With regard to plaintiff's argument that SSA employees at the Shreveport field office transgressed SSA regulations by initiating the instant CDR (in lieu of some other SSA office or the state agency), the court find no cognizable prejudice.[10]  Federal law ordinarily requires a CDR at least once every three years, 42 U.S.C. § 421(i).  Here, there is no indication in the record that, aside than the instant CDR, the Commissioner or state agency ever conducted a CDR in the preceding ten years since Thomas was found disabled.  Thus, plaintiff was long overdue for a CDR, regardless of the precipitating source.

Plaintiff also argues that, in 2011, officials at the Shreveport field office improperly filed a new application for disability benefits on his behalf.  However, there is no evidence of a 2011 disability application in the record.[11]

c)      Due Process Claim

Plaintiff contends that the Commissioner violated his due process rights during the administrative process.  However, the "hallmarks of due process are notice and opportunity for hearing appropriate to the nature of the case.*"  ELH v. U.S. Com'r, Soc. Sec. Admin.*, Civ. Action

---

[10]   Where the rights of individuals are affected, an agency must follow its own procedures, even where the procedures are more rigorous than otherwise would be required (*e.g.* by case law).  *See Hall v. Schweiker,* 660 F.2d 116, 119 (5th Cir. 1981) (citations omitted).   If an agency violates its own rules, with resulting prejudice, then the underlying proceedings are tainted, and any resulting actions cannot stand.  *Id.*

[11]   Plaintiff's confusion likely stems from forms that the state agency sent to medical providers to obtain updated medical information on his condition.  *See e.g.*, Tr. 356.  The form stated that "[t]he individual listed above has a disability *claim* pending in our office . . ."  *Id.* (emphasis added).

No. 11-1249, 2012 WL 2839806, at *1 (W.D. La. June 22, 2012), R&R adopted, 2012 WL

2839801 (W.D. La. July 10, 2012) (citations omitted).  Here, it is manifest that Thomas received

a hearing and ample notice at all stages of the administrative proceedings.  *See Mitchael v.*

*Colvin*, ___ F.3d. ___, 2016 WL 145843, at *4 (8th Cir. Jan. 13, 2016) (claimant received

constitutionally adequate due process, and there was no colorable due process violation alleged in

the complaint).

Thomas also complains at various points in the record that John Ratcliff, his attorney

from his initial federal court case in 2000-2001 did not receive notice of the state

agency/Commissioner's intention to conduct a CDR.  However, there is no indication in the

record that Thomas ever retained Ratcliff for purposes of the instant CDR.  Furthermore, there

was nothing to stop Thomas from notifying Ratcliff himself.[12]

Plaintiff also maintains that the Commissioner was obliged to appoint counsel to

represent him.  Although individuals enjoy a *statutory* right to counsel at social security hearings,

they do not have a *constitutional* right to counsel.  *Clark v. Schweiker*, 652 F.2d 399, 403 (5th

Cir. 1981) (Unit B) (citing *inter alia*, 42 U.S.C. § 406).  Thus, the Commissioner is not required

to furnish an individual with counsel at the hearing.  *Jeralds v. Richardson*, 445 F.2d 36, 39 (7th

Cir. 1971); *Garcia v. Califano*, 625 F.2d 354, 356 (10th Cir. 1980) (superseded by statute on

other grounds).  Instead, individuals are entitled to retain their *own* counsel or to appoint their

*own* representative.  *See* 20 C.F.R. §§ 404.1703, *et seq.*

---

[12]  Albeit, Thomas disagreed with Ratcliff's attempts to collect 25% of his past-due
benefits in his prior case.  *See Thomas v. Apfel*, Civ. Action No. 99-1815 (W.D. La. 4/19/2002)
(R&R).  This disagreement may explain Ratcliff's non-participation in the instant proceeding.  In
addition, Mr. Ratcliff retired around that time frame.

The claimant, however, may waive this right if given "sufficient information" to enable him to decide intelligently whether to retain counsel or proceed pro se. *Norden v. Barnhart*, 77 F. App'x 221, 223 (5th Cir. 2003) (citing *Clark v. Schweiker,* 652 F.2d 399, 403–404 (5th Cir.1981). "'Sufficient information' includes explanations of the possibility of free counsel, a contingency agreement, and the limitation on attorney's fees to 25% of past due benefits awarded." *Id.*

Here, plaintiff contends that he did not waive his right to representation at the ALJ hearing.  He emphasizes that he did not sign the waiver form, and explicitly invoked his right to counsel at the ALJ hearing.  *See* Tr. 33-36.  The ALJ, however, declined to continue the hearing. *Id*.  She noted that the matter had been scheduled previously, but postponed.  *Id*.  She further advised Thomas that he was free to retain an attorney, and if the attorney enrolled, he or she could seek to reopen the hearing and add supplemental information.  *Id*., Tr. 39.  Moreover, the ALJ advised Thomas that it was *his* responsibility to retain someone to represent him.  (Tr. 37).  She also explained that some organizations offered free representation.  (Tr. 33).  In addition, Thomas received numerous written notices advising him of his right to representation.  *See e.g.,* Tr. 152-157.[13]

More than two months after the March hearing, plaintiff petitioned the ALJ for a supplemental hearing, with attorney representation.  (Tr. 199).  However, the record does not contain a notice indicating that Thomas had retained a representative.  *See* 20 C.F.R. § 404.1707.

---

[13]  Thomas was well aware that attorney's fees are limited to a maximum of 25 percent of past due benefits – in no small part because he personally litigated the same or similar issue in his previous court case.  *See Thomas v. Apfel*, Civ. Action No. 99-1815 (W.D. La. 4/19/2002) (R&R).

Rather, it appears that he again wanted the Commissioner to appoint him counsel.  Not surprisingly, the ALJ did not find grounds for a supplemental hearing, and proceeded to issue her decision on July 16, 2014 – almost one year after Thomas had requested a hearing before an ALJ. *See* Tr. 148-151.

The court finds that Thomas knowingly and effectively waived his right to counsel by not retaining counsel for one year, or more (if one counts the period before the Disability Hearing Officer).  Moreover, Thomas had every incentive to stonewall the administrative proceedings because he had elected to continue receiving disability benefits while he prosecuted his appeal. (Tr. 248-249).

The court further notes that when a claimant is unrepresented at the hearing, the ALJ's obligation to fully and fairly develop the record gives rise to a special duty to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984) (citations omitted).  The ALJ's failure to develop an adequate record, however, does not automatically compel reversal.  *Id*.  Rather, "[a]s in the case of a hearing held without waiver of the right to counsel, the claimant must, in addition, show that she was prejudiced as a result of [sic] scanty hearing.  She must show that, had the ALJ done his duty, she could and would have adduced evidence that might have altered the result."  *Kane supra* (internal quotation marks and citations omitted).  Plaintiff has not made that showing here.

d)      Equal Protection

Plaintiff further complains, in conclusory fashion, that the Commissioner/state agency violated his right to equal protection of the laws.  However, the instant complaint is for review of the Commissioner's decision under 42 U.S.C. § 405(g), not an action under *Bivens v. Six*

15

*Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999 (1971) ("*Bivens*").  Furthermore, a civil rights action against the United States is barred by sovereign immunity.  *Affiliated Prof'l Home Health Care Agency v. Shalala*, 164 F.3d 282, 286 (5th Cir. 1999) (citations omitted).  Moreover, a *Bivens* action only supports a claim against government officers in their individual capacities.  *Id*.  As there is no indication that plaintiff sued the Commissioner in her individual capacity, neither *Bivens,* nor the civil rights statutes provide a valid jurisdictional predicate for this claim.  *Id*.

In any event, to succeed on an equal protection claim, plaintiff must allege that he was intentionally treated differently from "similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Taylor v. Johnson,* 257 F.3d 470, 472 (5th Cir.2001).   He has not made that showing here.

e)      Alleged Representation by AUSA

Plaintiff suggests in his brief and affidavit that the Assistant U.S. Attorney ("AUSA") of record told him to advise the court that the Commissioner had committed administrative errors. *See* doc. # 17-1.  In her response brief, however, counsel explained that she told plaintiff that "she was not authorized to compromise his claim and that if the SSA found that an error occurred warranting remand, the Government would seek his consent to file a motion for remand." (Gov.'t Response, pg. 10).

Given Mr. Thomas's frequent misunderstandings of the administrative process, the court finds that the AUSA's recollection of the telephone call is certainly more plausible than that of Mr. Thomas.  There also is no indication that the Commissioner authorized the AUSA to concede remand.  In addition, there is no evidence that plaintiff relied on the alleged

representation to his detriment.  To the contrary, he proceeded to vigorously pursue the instant

case, with numerous filings in support of his arguments.

## III.    Arguments Directly Related to the Commissioner's Decision

a)    <u>Meets or Equals Listing 3.03B</u>

Plaintiff contends that the record evidence warrants a finding that his impairments meet

or equal Listing 3.03 for asthma, and therefore, the ALJ's contrary finding is erroneous.  The

relevant listing provides, as follows,

> 3.03 Asthma. With:
>
> A. Chronic asthmatic bronchitis. Evaluate under the criteria for chronic
> obstructive pulmonary disease in 3.02A;
>
> Or
>
> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring
> physician intervention, occurring at least once every 2 months or at least six times
> a year. Each in-patient hospitalization for longer than 24 hours for control of
> asthma counts as two attacks, and an evaluation period of at least 12 consecutive
> months must be used to determine the frequency of attacks.

Listing 3.03, 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Asthma attacks as described in Listing 3.03B contemplate ,

> prolonged symptomatic episodes lasting one or more days and requiring intensive
> treatment, such as intravenous bronchodilator or antibiotic administration or
> **prolonged** inhalational bronchodilator therapy in a hospital, emergency room or
> equivalent setting.  Hospital admissions are defined as inpatient hospitalizations
> for longer than 24 hours.  **The medical evidence must also include information
> documenting adherence to a prescribed regimen of treatment as well as a
> description of physical signs**.

Listing 3.00C (emphasis added).

To establish that a claimant's injuries meet or medically equal a listing, medical findings

must support all of the criteria for a listed impairment (or most similarly listed impairment).  *See*

*Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990).  An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify.  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990).

In her decision, the ALJ found that plaintiff's asthma did not meet or equal Listing 3.03 because he did not have results on pulmonary functioning testing or attacks requiring physician intervention at the requisite frequency.  (Tr. 15-19).  In her analysis, the ALJ reviewed plaintiff's extensive medical records going back to 2000.   She noted Thomas's ongoing non-compliance with his medication regime, as well as his sporadic/infrequent asthma exacerbations.  For instance, as early as March 15, 2001, one of plaintiff's treating physicians, Virginia Small, M.D., discussed with plaintiff how he had not been refilling his medication, which caused him to compensate with higher doses of prednisone instead.  (Tr. 773-774).  On November 26, 2001, Dr. Small noted that plaintiff had very severe asthma, but he was not compliant with refilling his medication or seeking care from a pulmonologist.  (Tr. 764-756).

On April 22, 2004, John Paul Areno, M.D., characterized a recent pulmonary function test as supporting a moderate obstruction that was significantly improved from December 2003. (Tr. 612-613).  On February 6, 2006, Dr. Areno interpreted a recent pulmonary function test as revealing no more than mild obstructive ventilatory impairment.  (Tr. 592).  A February 28, 2007, pulmonary function test showed moderate obstructive ventilatory impairment.  (Tr. 583).

Between 2007 and 2009, Thomas failed to appear for multiple pulmonary function studies.  (Tr. 575-577).  In 2008, he did not appear on three occasions for a home oxygen appointment at the VA; thus, it was canceled.  (Tr. 567).  In October 2008, Thomas was discharged from the VA Chest Clinic for failure to keep multiple appointments.  (Tr. 574).  He

18

was on maximal therapy with no room for addition of new therapy.  *Id.*

On January 16, 2011, Thomas went to the emergency room with complaints of asthma exacerbation.  (Tr. 382-388).  The physician, however, merely re-filled Thomas's prescription and discharged him in around one hour.  *Id.*[14]

On April 19, 2011, Thomas was referred to Willis-Knighton Quick Care because he was out of medication and wheezing.  (Tr. 365-367).  He received a brief, ten-minute nebulizer session and was given Albuterol.  *Id.*[15]

A November 10, 2011, pulmonary function test revealed moderate obstructive lung disease.  (Tr. 352-355).  The results did not meet the severity criteria for Listing 3.03A.

On May 23, 2012, Thomas returned to Willis-Knighton Quick Care with complaints of intermittent wheezing for the past few days.  (Tr. 359-361).  However, he had been out of his medication for the past two days.  *Id*.  Thomas reported that he was not in any distress; he just needed his medication refilled.  *Id*.  The facility administered a brief, ten-minute nebulizer session and sent him on his way.  *Id.*[16]

On August 2, 2012, plaintiff went to the hospital with complaints of wheezing caused by an allergic reaction to Pravastatin.  (Tr. 389-397).  Severe respiratory distress was noted.  *Id*.  He

---

[14]  This emergency room visit does not satisfy the criteria to be considered an "attack" for purposes of 3.03B.

[15]  This visit does not meet the criteria for an attack under 3.03B:  plaintiff was out of medication, and received brief, rather than prolonged treatment.

[16]  This visit does not meet the criteria for an attack under 3.03B:  plaintiff was out of medication, and received brief, rather than prolonged treatment.

19

was treated and released under three hours.  *Id*.[17]

On October 12, 2012, non-examining agency physician, Hollis Rogers, M.D., reviewed the record and noted only two treatments for asthma within the past year.  (Tr. 407).  He further remarked that an October 11, 2011, pulmonary function test showed moderate pulmonary disease.  *Id*.  Dr. Hollis recommended cessation of disability, and ultimately suggested an RFC for light work, with the need to avoid concentrated exposure to wetness, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, etc.  (Tr. 410-417).

On November 20, 2012, Thomas went to Peter Boggs, M.D., for help with his asthma. (Tr. 419-422).  A pulmonary function study administered that date revealed moderate obstructive pulmonary impairment.  *Id*.  Boggs diagnosed asthma, chronic; ASA-NSAID Syndrome; nasal polyps; denied chronic sinusitis; recent CT of chest was normal; allergic rhinitis; and allergic conjunctivitis.  *Id*.  Boggs scheduled Thomas to return for follow-up in one week, but Thomas never did.  *Id*.

On February 6, 2013, non-examining agency physician, Johnny Craig, M.D., wrote that he was in agreement with the assessment of a light RFC with environmental restrictions to moderate fumes/gases.  (Tr. 424).  He documented that the recent pulmonary function tests were consistent with an RFC for light work.  *Id*.  Nonetheless, Craig wanted to obtain a pulmonary function study done to SSA specifications because Thomas originally had been found disabled by the "legal system."  *Id*.[18]

---

[17]  While plaintiff was treated intravenously, he attributed his distress to an allergic reaction to medication – not an asthma exacerbation.

[18]  Plaintiff fixates upon Dr. Craig's statement that the agency potentially was "reversing" an allowance by the courts.  It is apparent, however, that Dr. Craig did not use the word,

On February 22, 2013, Thomas went to the hospital with complaints of an asthma exacerbation that began five days earlier.  (Tr. 936-940).  Upon examination, Thomas did not display signs of respiratory distress, with only mild wheezing.  *Id*.  He received a short course of nebulizers and discharged that same day.  *Id*.

In a March 27, 2013, Request for Advice, disability examiner Mike McClure documented that Thomas attended one pulmonary function study and took his bronchodilator, which he had been instructed not to do.  (Tr. 426).  Furthermore, Thomas did not keep his second appointment and wrote a letter advising the state agency that it did not have the right to review his case because he was found disabled by the court.  *Id*.  In reply, Dr. Craig recommended that the state agency cease Thomas's disability, secondary to his failure to cooperate/insufficient evidence. (Tr. 427).

At a May 24, 2013, office visit with Cheryl Smith, M.D., Thomas reported that his asthma had been stable with his medication.  (Tr. 1110-1113).

On June 20, 2013, Thomas went to the emergency room with complaints of an asthma exacerbation that began that day.  (Tr. 928-934).  He was noted to be in mild respiratory distress, with moderate wheezing.  *Id*.  He received two doses of nebulizer, 18 minutes apart, and discharged.  *Id*.

A July 25, 2013, progress note from Rama Kakani, M.D., confirmed that Thomas's asthma was under control with steroids and inhalers.  (Tr. 1042-1043).

On August 28, 2013, Thomas went to his first visit with pulmonologist, Paul Schuler,

---

"reversal" in the legal sense.  Rather, he meant that the agency was disturbing a longstanding allowance, and he wanted to ensure that new evidence supported medical improvement.

M.D.  (Tr. 823-827).  Thomas reported that he experienced asthma attacks daily.  *Id*.  Schuler observed that Thomas met the criteria for severe, persistent asthma; FEV1 of less than 60 % predicted; continual symptoms despite aggressive treatment; limited ability to engage in physical activity.  (Tr. 826).[19]  He recommended avoidance of *heavy* exertion, limitation of cold air exposure, and the need to avoid asthma triggers, and cigarette smoke.  *Id*. (emphasis added).

On September 4, 2013, Thomas returned to the hospital with complaints of an asthma exacerbation that began one day earlier.  (Tr. 1071-1078, 1085-1087).  Upon examination, moderate to severe respiratory distress was noted.  *Id*.  His symptoms improved upon administration of medication, but he still was wheezing.  *Id*.  Thus, he was admitted overnight. *Id*.[20]

Thomas returned to Dr. Schuler on October 1, 2013.  (Tr. 828-831).  A pulmonary function test administered that day produced results that did not meet listing level severity for pulmonary insufficiency.  *Id*.  Dr. Schuler characterized the test results as demonstrating a moderately severe obstructive ventilatory impairment.  (Tr. 841-843).  He further noted that Thomas had good response to inhaled bronchodilators.  *Id*.  On December 4, 2013, Dr. Schuler characterized the impairment as moderate to severe, with no significant response to inhaled bronchodilators.  (Tr. 844-847).

---

[19]  Spirometry from August 28, 2013, demonstrated an FEV1 of 1.42 liters, which, with plaintiff's height of 5'7", does not meet the severity for Listing 3.02A.

[20]  A September 5, 2013, consultation report noted that plaintiff had suffered an exacerbation and was hospitalized from September 4-5, 2013.  (Tr. 1079-1082).  He was treated in the emergency room with an inhaler and was given several doses of IV Solu-Medrol, with improvement, and requesting to go home.  *Id*.  Thomas denied missing any doses of his medication.  (Tr. 1084).

Thomas was hospitalized from November 8-11, 2013, with complaints of chest pain.  *See* Tr. 902-905).  He was diagnosed with non-cardiac chest pain.  *Id*.  During the admission, Pedro Gonzalez-Morales, M.D. documented that Thomas **maintained an active lifestyle and exercised regularly**.  (Tr. 903).

On March 11, 2014, Thomas's primary care physician, Cheryl Smith, M.D., wrote a letter To Whom it May Concern, concluding that Thomas was totally disabled, and unable to work in any setting.  (Tr. 822).  Nevertheless, her progress note from that same date reflect that Thomas was not always compliant with his medication or appointments.  (Tr. 1118).

On March 13, 2014, plaintiff's treating pulmonologist, Paul Schuler, M.D., wrote that Thomas had severe, persistent asthma.   (Tr. 1552).  He opined that Thomas was unable to work around fumes, chemicals, smoke, dust, carpet, or allergens.  *Id*.  He concluded that, because of Thomas's multiple medical problems, he was disabled and incapable of gainful employment.  *Id*.

On May 19, 2014, Thomas was hospitalized overnight because of an asthma exacerbation.  (Tr. 1136-1137).  Thomas reported that he experienced approximately three hospitalizations per year because of asthma exacerbations.  *Id*.

The foregoing summary provides substantial evidence to support the ALJ's determination that Thomas's impairment(s) did not meet or equal a listing – for the period at issue.[21]

---

[21]  Plaintiff questions how he could have been found disabled up until December 31, 2012, then not disabled for a six month period, before again being found disabled as of June 20, 2013, pursuant to his July 21, 2014, disability application.  *See* Tr. 2.  The answer is that there is substantial evidence, for the period at issue, establishing that plaintiff's impairments were not as limiting as they once were or later reverted.  Furthermore, as the ALJ noted, plaintiff did not begin to experience more frequent asthma exacerbations until *after* the state agency initiated the instant disability review.  (Tr. 18-19).  There also was evidence of medical non-compliance in the file.  *Id*.

b)    Residual Functional Capacity Assessment (RFC)

At the outset, the court finds that the ALJ's RFC is supported by the assessments of the non-examining agency physicians, Drs. Craig and Rogers.  The court further finds no cognizable error with the ALJ's implicit decision to favor the assessments of the non-examining physicians over statements of disability expressed by plaintiff's treating physicians, Drs. Smith and Schuler, in their respective March 2014 letters.

First, plaintiff cannot protest, in good faith, the assessments by Drs. Craig and Rogers on the basis that they never examined him, when, on multiple occasions, plaintiff steadfastly declined to attend agency and ALJ-mandated consultative examinations.  Indeed, plaintiff's un-excused failure to attend the consultative examinations, alone, provides alternative grounds to support the Commissioner's determination that his disability ended.  *See* 20 C.F.R. § 404.1594(e)(2) and 20 C.F.R. § 404.1518(a).

Second, as a result of the state agency's finding that plaintiff was disabled retroactive to June 2013 pursuant to his 2014 disability application, the March 2014 letters are not relevant to the current decision, but likely played a role in the state agency's determination that plaintiff's condition later deteriorated.  In fact, in August 2013, plaintiff's treating pulmonologist, Dr. Schuler, opined, that Thomas should avoid *heavy* exertion, limit his exposure to cold air, and avoid both asthma triggers and cigarette smoke.  (Tr. 823-827) (emphasis added).  These limitations are consistent with the ALJ's RFC.

Third, Drs. Smith and Schuler's statements that plaintiff was disabled and/or unable to work are not accorded any special significance under the regulations.  *See* 20 C.F.R. § 404.1527(e)(1); *Frank v. Barnhart*, 326 F.3d 618 (5th Cir. 2003).  Moreover, they are

contradicted by Dr. Schuler's own assessment from August 2013.

In addition to the medical evidence, there is other record evidence supporting the ALJ's RFC.  For instance, an August 22, 2013, psychiatry note indicated that plaintiff was in Nevada at a bowling tournament for veterans.  (Tr. 1030).  Indeed, he likes to bowl recreationally.  (Tr. 1046).  Clearly, plaintiff's asthma does not preclude him from meeting the lifting requirements for light work.[22]  Also, a social worker note from October 9, 2013, indicated that plaintiff's wife had called and complained that plaintiff had a gambling addiction and was not paying household bills.  (Tr. 1019-1020).  The court takes judicial notice that cigarette smoke permeates throughout casinos, even straying into non-smoking areas or rooms.  Thus, if plaintiff could tolerate casino environments at the frequency of someone with a gambling problem, he certainly could handle jobs with less than concentrated pulmonary irritants.  In any event, according to the Dictionary of Occupation Titles, there are no environmental conditions present at all in the three jobs identified by the vocational expert.  *See* DOT # 209.587-034, 1991 WL 671802; DOT # 318.687-018, 1991 WL 672757; and DOT # 222.587-038 , 1991 WL 672123.[23]

Plaintiff further argues that the ALJ should have given effect to, or at least considered his 100 percent permanent and total disability rating issued by the VA in 2003.  A VA rating of total and permanent disability is not legally binding on the Commissioner because the criteria applied by the two agencies differ.  *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001) (citations

---

[22]  Even if plaintiff' impairments limited him to sedentary work, the vocational expert identified several sedentary jobs that plaintiff was capable of performing, and which exist in substantial numbers in the national economy.  *See* Tr. 77.

[23]  Plaintiff questions the availability of jobs that have little or no pulmonary irritants.  However, the vocational *expert* so testified, and her testimony is consistent with the Dictionary of Occupational Titles.

omitted).  However, it does constitute evidence that is entitled to a certain amount of weight that

the ALJ must consider.  *Id*.  Although in most cases the VA disability rating is entitled to "great

weight," the "relative weight to be given this type of evidence will vary depending upon the

factual circumstances of each case."  *Id*.  Thus, the Commissioner need not give "great weight"

to a VA disability determination so long as she provides valid reasons for not doing so.  *Id*.

In contrast to the typical disability case where a claimant is applying for disability

initially, the matter *sub judice* stems from a CDR that determined that plaintiff's impairments no

longer were disabling.  There is no indication that the VA ever re-examined Thomas's case to

determine whether his condition had improved for the period at issue.  Thus, a VA finding of

total and permanent disability issued some ten years earlier would have no significant bearing on

whether plaintiff's impairments had improved.  Accordingly, to the extent that the ALJ erred by

failing to address the VA decision, any error was harmless.

Relatedly, plaintiff filed with this court military discharge papers from 1996 to establish

that he was exposed to sarin and cyclosarin during his service.  [doc. # 32].   However, there is

no indication that these documents were part of the administrative record.  Thus, at best, the

court could remand the matter to the Commissioner for consideration of plaintiff's recently

adduced evidence.  However, the court may order additional evidence to be taken before the

Commissioner "only upon a showing that there is new evidence which is material and there is

good cause for the failure to incorporate such evidence into the record in a prior proceeding."

*Pierre v. Sullivan,* 884 F.2d 799, 803 (5th Cir. 1989) (citing, 42 U.S.C. § 405(g)).  To justify

remand, the evidence must be "new," and not merely cumulative of what is already in the record.

*Id.*  (citation omitted).  The evidence must also be "material"; *i.e*., relevant, probative, and likely

to have changed the outcome of the Commissioner's determination.  *Id.*  Finally, the claimant must demonstrate good cause for not having incorporated the new evidence into the administrative record.  *Id.*

The court finds that plaintiff's 1996 discharge papers, plus any other evidence that he submitted to the court which was not in the administrative record, does not meet the criteria for remand.  For instance, no one questions that plaintiff has an asthma impairment, or even that it stems from his military service.  The issue is the severity and extent of the limitations caused by his impairments.  Thus, the discharge papers are not material.  Moreover, plaintiff has not established good cause for his failure to present this, and any other new evidence, to the ALJ or Appeals Council, in the first instance.  *Pierre, supra* (good cause for remand is not met unless plaintiff provides proper explanation to excuse his failure to submit the evidence earlier).[24]

Plaintiff also contends that the ALJ failed to conduct a longitudinal evaluation of his entire medical history.  The court disagrees.  The ALJ plainly considered plaintiff's impairments from the comparison point decision in 2001 through the date of her decision.  *See* Tr. 16-19.

Finally, plaintiff argues that the Commissioner is improperly calculating his current disability benefits payments that were awarded pursuant to his favorable 2014 application.  However, it is likely that the Commissioner is reducing plaintiff's current benefits in order to recoup the benefits that plaintiff continued to receive for the period at issue in this case while he

---

[24]  Plaintiff argues that the ALJ knew that his file was incomplete, yet refused to permit him to introduce 1000-1700 pages of additional medical records.  However, the administrative record before the court is 1553 pages in length.  [doc. # 14].  It includes plaintiff's VA medical treatment records from the 1990s and 2000s.  Plaintiff has not identified any missing record that the ALJ refused to admit which would have materially affected the outcome of his case.

pursued his appeal.  *See* Tr. 248-249.[25]  In any event, this issue is not presently before the court.

Plaintiff will have to exhaust his administrative remedies before seeking judicial review of the

Commissioner's final decision on that matter.

### Conclusion

The evidence in this case was by no means uniform and could have supported a different

outcome.  Such conflicts in the evidence, however, are for the Commissioner to resolve.  *Selders*

*v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d

656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try

the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence

weighs against the Commissioner's decision."  *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2000).[26]

That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in

the administrative process is not required, and any errors do not undermine confidence in the

decision.

For the foregoing reasons, the undersigned finds that the Commissioner's determination

that the claimant was no longer disabled under the Social Security Act, for the period at issue, is

supported by substantial evidence and remains free of legal error.  Accordingly,

IT IS RECOMMENDED that plaintiff's motion for summary judgment [doc. # 18] be

---

[25]  When he elected to continue receiving benefits, plaintiff acknowledged that he would
have to pay the money back if he lost his appeal.  *Id*.

[26]  Generally, courts "only may affirm an agency decision on the basis of the rationale it
advanced below."  *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010)
(citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged
error or omission, there is "no realistic possibility" that the ALJ would have reached a different
result.  *Id*.  This exception is applicable here.

DENIED.

IT IS FURTHER RECOMMENDED that the Commissioner's decision to deny disability benefits be AFFIRMED, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 2nd day of February 2016.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE